# 2004 DTA 120

## TRIBUNAL DE CIRCUITO DE APELACIONES
## REGIÓN JUDICIAL

### LUIS PABÓN MARRERO
Apelante

v.

### PFIZER DE PUERTO RICO, INC.
Querellada-Apelada

Núm. KLAN-2002-01192

San Juan, Puerto Rico, a 30 de junio de 2004

Panel integrado por su Presidente, el Juez Sánchez Martínez,
la Juez Cotto Vives y el Juez Vivoni del Valle

## TEXTO COMPLETO DE LA SENTENCIA

El Tribunal de Primera Instancia dictó sentencia sumaria en la que desestimó una querella del señor Luis Pabón Marrero por discrimen por razón de impedimento y por despido injustificado. Inconforme, el querellante apeló ante nos. Por los fundamentos que exponemos a continuación, se confirma la sentencia apelada.

El querellante Luis Pabón Marrero comenzó a trabajar para Warner Lambert como mecánico industrial el 9 de diciembre de 1991. Posteriormente, Pfizer, una corporación dedicada a la manufactura y producción de productos farmacéuticos, pasó a ocupar las facilidades de Warner Lambert. El señor Pabón Marrero trabajaba como mecánico en la unidad de negocio de Efferdent en la planta de consumo de Pfizer y se reportaba al señor Freddie Vázquez y al señor Jaime Rivera.

En agosto de 1998, el señor Pabón Marrero se lastimó la rodilla derecha en un accidente no relacionado con el empleo y permaneció fuera de su empleo hasta el 26 de octubre de 1998, fecha en que regresó a trabajar sin restricción alguna.

Un año más tarde, el 31 de agosto de 1999, el señor Pabón Marrero fue operado de la rodilla derecha para reparar el ligamento cruzado anterior. Éste estuvo fuera de su trabajo desde la fecha de su operación hasta el 17 de enero de 2000, es decir, cuatro y medio meses, y recibió los beneficios de incapacidad temporal (SINOT).

El 27 de diciembre de 1999, el Dr. José Suárez Castro, ortopeda del señor Pabón Marrero, le proveyó un certificado médico para que éste pudiese reportarse a trabajar el 17 de enero de 2000. El certificado médico en cuestión incluia una serie de restricciones como la de no levantar objetos pesados, no caminar distancias largas, no arrodillarse o doblarse y no trabajar turnos de noche. Con ese certificado médico, el 17 de enero de 2000, el señor Pabón Marrero se reportó a trabajar y fue primeramente al dispensario de Pfizer, donde fue atendido por el Dr. Roberto López Nieves, empleado de la compañía. El Dr. López Nieves suscribió el formulario de *"Evaluación Médica para Trabajar"*, en el que autorizó al señor Pabón Marrero a regresar a su trabajo sujeto a las siguientes restricciones en sus tareas y funciones: no levantar más de 15 libras, no caminar de forma prolongada, no arrodillarse o doblarse en cuclillas, no hacer turnos de noche y alternar la posición sentada y de pie, según lo tolerara.

El señor Pabón Marrero se reportó a su área de trabajo, y su supervisor, el señor Jaime Rivera, le indicó que debido a las restricciones médicas no podía reintegrarlo a su posición. Esa determinación había sido discutida

con el señor Freddie Vázquez, supervisor inmediato del señor Pabón Marrero, con el señor Manuel Medina, Gerente del Departamento de Ingeniería, y con la señora Blanca Cebollero, Directora de Recursos Humanos.

Ante esa situación, el señor Pabón Marrero acudió nuevamente donde el Dr. López Nieves, quien suscribió un nuevo formulario de *"Evaluación Médica para Trabajar"*, en el que hizo constar que el empleado Pabón Marrero no estaba capacitado para trabajar y no había podido ser acomodado en su área de trabajo debido a las restricciones. Dicho galeno le suscribió una nota al Dr. Suárez Castro, ortopeda del querellante Pabón Marrero, en la que le solicitó que indicara la duración de las restricciones médicas del señor Pabón Marrero y que las revisara para someterlas al Comité de Tarea Modificada de la compañía para evaluar una posible relocalización temporera o ajuste de las funciones.

Ese mismo día, 17 de enero de 2000, el doctor José F. Irizarry le expidió al señor Pabón Marrero una certificación médica en la que indicó que no podía trabajar hasta el 21 de febrero de 2000. Pfizer recibió este certificado al día siguiente, 18 de enero de 2000. Ese día, la compañía expidió un nuevo formulario de *"Evaluación Médica para Trabajar"* que señalaba que el señor Pabón Marrero no estaba capacitado para trabajar y donde se le instruia que regresara para una nueva evaluación el 21 de febrero de 2000.

El 23 de febrero de 2000, el señor Pabón Marrero fue evaluado nuevamente por el médico de la compañía, Dr. López Nieves, quien certificó que el señor Pabón Marrero no estaba capacitado para trabajar y que se encontraba pendiente de aprobación. En ese documento, se le indicó al empleado Pabón Marrero que debía volver para una nueva evaluación dentro de dos días. Ese mismo día —23 de febrero de 2000—, el empleado Pabón Marrero presentó a la aseguradora de Pfizer, Medical Card System, Inc., una reclamación de beneficios por incapacidad a largo plazo, la cual fue aprobada y le pagaría al señor Pabón Marrero $1,377.57 mensuales a partir del 28 de febrero de 2000.

El 24 de febrero de 2000, el Dr. Suárez Castro expidió una certificación médica al señor Pabón Marrero mediante la cual le autorizó a regresar a su trabajo el 6 de abril de 2000. Esa certificación fue recibida por el Dr. López Nieves, el 1 de marzo de 2000.

Posteriormente, el 24 de abril de 2000, el Dr. Irizarry expidió un certificado médico en el que indicó que el señor Pabón Marrero no podía trabajar hasta el 5 de mayo de 2000. El Dr. López Nieves recibió la certificación el 28 de abril de 2000 y éste llenó el formulario de *"Evaluación Médica para Trabajar"* en el que indicó que el empleado Pabón Marrero debía regresar para una nueva evaluación el 8 de mayo de 2000.

El Dr. Suárez Castro nunca emitió ni le notificó a Pfizer las restricciones específicas a las tareas y funciones del empleado Pabón Marrero y el caso nunca fue evaluado por el Comité de Tarea Modificada de la compañía.

El 31 de enero de 2001, el señor Pabón Marrero visitó la Unidad Anti Discrimen del Departamento del Trabajo y Recursos Humanos de Puerto Rico y presentó una querella por discrimen por razón de impedimento.

Posteriormente, el 20 de febrero de 2001, el señor Pabón Marrero presentó en el Tribunal de Primera Instancia una querella por discrimen por razón de impedimento y por despido injustificado bajo el procedimiento especial sumario establecido en la Ley 2 de 17 de octubre de 1961, 32 L.P.R.A. sec. 3118 *et seq.* En la querella, el señor Pabón Marrero adujo que había sido operado de la rodilla y Pfizer se había negado a proveerle un acomodo razonable y luego lo había despedido causándole daños, infringiendo así la Ley 80 de 30 de mayo de 1976, 29 L.P.R.A. sec. 185(a) *et seq.*, la Ley 44 de 2 de junio de 1985, 1 L.P.R.A. sec. 501 *et seq.*, el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, y la *Americans with Disabilities Act (Ley A.D.A.)*, 42 U.S. C. sec. 12101 *et seq.*

En su querella, el señor Pabón Marrero solicitó que Pfizer lo restituyera en su empleo, le pagara el salario

dejado de percibir, le compensara por los daños sufridos y que la compañía desistiera de sus actos discriminatorios.

Pfizer presentó una moción de prórroga para contestar la querella. El Tribunal de Primera Instancia la denegó y le ordenó a Pfizer contestar la querella, pero ya la compañía había sometido su contestación.

Así las cosas, el 7 de marzo de 2001, la querella presentada por el querellante en la Unidad Anti Discrimen fue transferida al *Equal Employment Opportunity Commission (E.E.O.C.)*. El 27 de marzo de 2001, la investigadora de la E.E.O.C., Sra. Arlean C. Nieto, le cursó una carta al querellante en la que le informó que el término de 300 días a partir del último acto discriminatorio que tenía la E.E.O.C. para investigar cualquier querella había expirado, por lo que le anejaba el permiso para litigar (*Notice of Right to Sue*). El 11 de abril de 2001, la E.E.O.C. desestimó la querella por haber sido presentada fuera del término de 300 días.

Por su parte, Pfizer le solicitó al Tribunal de Primera Instancia que dictara sentencia sumaria y desestimara la totalidad del pleito. Pfizer fundamentó su solicitud en tres argumentos: (1) en que la causa de acción por discrimen por razón de impedimento al amparo de la Ley A.D.A. estaba prescrita, debido a que el querellante no había agotado los remedios administrativos, hecho que también privaba de jurisdicción al tribunal *a quo*; (2) en que la causa de acción por discrimen por razón de impedimento al amparo de la Ley 44 y la causa de acción por daños bajo el Art. 1802 estaban prescritas; y (3) en que la causa de acción por despido injustificado no procedía en derecho.

En cuanto al primer argumento sobre la prescripción de la causa de acción bajo la Ley A.D.A., Pfizer adujo que un demandante que interesa presentar una reclamación al amparo de esa ley, tiene que agotar los remedios administrativos como condición precedente a presentar una reclamación en el tribunal. Para ello, el empleado tiene un término de 300 días a partir de la fecha del acto discriminatorio para presentar un cargo administrativo en la Unidad Anti Discrimen del Departamento del Trabajo.

En el caso de autos, Pfizer indicó que la causa de acción por discrimen por razón de impedimento instada por el querellante al amparo de la Ley A.D.A. estaba prescrita, debido a que de las propias admisiones del querellante en la querella presentada ante la E.E.O.C., así como de las admisiones hechas por éste en la deposición que se le tomó, surgía que el último acto discriminatorio había ocurrido el 17 de enero de 2000. Por tal razón, el querellante tenía un término de 300 días a partir de esa fecha, vencedero el 12 de noviembre de 2000, para presentar una querella ante la Unidad Anti Discrimen o ante la E.E.O.C. Debido a que el querellante Pabón Marrero presentó su querella ante la Unidad Anti Discrimen el 31 de enero de 2001, Pfizer adujo que ya había expirado el término de 300 días que el querellante tenía para así hacerlo.

Pfizer añadió que, si bien el querellante visitó la Unidad Anti Discrimen el 21 de agosto de 2000, de los hechos incontrovertidos surgía que en esa ocasión el querellante sólo había sido orientado y no había presentado querella alguna, sino que se había llevado los documentos para consultarle a su abogado, hecho que no interrumpió el término de 300 días para presentar la querella ante la Unidad Anti Discrimen o ante la E.E.O.C.

Pfizer señaló que no habiéndose agotado los remedios administrativos correspondientes en cuanto a la causa de acción por discrimen por razón de impedimento al amparo de la Ley A.D.A. antes de la presentación de la querella en el Tribunal de Primera Instancia el 20 de febrero de 2001, no sólo la causa de acción estaba prescrita, sino que también el tribunal *a quo* carecía de jurisdicción sobre la materia respecto a esa causa de acción.

La segunda razón aducida por Pfizer para sostener su solicitud de sentencia sumaria, era que las causas de acción por discrimen por razón de impedimento y por daños al amparo de la Ley 44 y del Art. 1802 del Código Civil, respectivamente, también estaban prescritas. Ello, debido a que el querellante tenía un año a partir del

último acto discriminatorio ocurrido el 17 de enero de 2000 para presentar su causa de acción por daños y perjuicios, término que vencía el 16 de enero de 2001. Debido a que el querellante presentó la querella en el caso de autos el 20 de febrero de 2001, Pfizer sostuvo que las causas de acción estaban prescritas. Pfizer también señaló que el término de un año no se interrumpió por la querella presentada ante la Unidad Anti Discrimen, puesto que la querella fue presentada en esa Unidad el 31 de enero de 2001, cuando ya había expirado el término para presentarla, el cual venció el 16 de enero de 2001.

Pfizer también descartó que hubiese habido una interrupción en el término de un año por la interposición de una reclamación extrajudicial. A esos efectos, Pfizer señaló que ese hecho surgía de las admisiones del querellante durante su deposición, puesto que el querellante admitió que posterior al último acto discriminatorio el 17 de enero de 2000, ni él ni su abogado se comunicaron con la compañía para reclamar derecho o beneficio alguno de forma extrajudicial.

El tercer argumento esgrimido por Pfizer en su solicitud de sentencia sumaria sostenía que la causa de acción por despido injustificado incoada al amparo de la Ley 80, no procedía en derecho. A esos efectos, Pfizer indicó que sólo en la eventualidad de que el empleado demostrara que no medió justa causa para su despido, sería obligación del patrono indemnizar al obrero. Pfizer señaló, sin embargo, que de los hechos incontrovertidos del caso surgía que el despido del querellante estuvo justificado de conformidad con la Ley 80.

Pfizer argumentó que un empleado no tenía derecho a ser reinstalado en su empleo luego de haber disfrutado de una licencia al amparo de la Ley 139, a menos que cumpliera con los siguientes requisitos establecidos en la Sec. 3 de la Ley 139, 11 L.P.R.A. sec. 203:

*"(q) Reinstalación después de incapacidad – En los casos de incapacidad para el trabajo de acuerdo con las disposiciones de este capítulo, el patrono vendrá obligado a reservar el empleo que desempeña el trabajador al momento de comenzar la incapacidad y a reinstalarlo en el mismo, sujeto a las siguientes condiciones:*

*(1) Que el trabajador requiera al patrono que lo reponga en su empleo dentro del término de quince (15) días, contados a partir de la fecha en que fuere dado de alta, y siempre y cuando dicho requerimiento no se haga después de transcurridos [sic] un (1) año desde la fecha de comienzo de la incapacidad;*

*(2) que el trabajador esté mental y físicamente capacitado para ocupar dicho empleo en el momento en que solicite del patrono dicha reposición, y*

*(3) que dicho empleo subsista al momento en que el trabajador solicite su reposición. Se entenderá que el empleo subsiste cuando el mismo esté vacante o lo ocupe otro trabajador. Se presumirá que el empleo estaba vacante cuando el mismo fuere cubierto por otro trabajador dentro de los treinta (30) días siguientes a la fecha en que se hizo el requerimiento de reposición."*

Pfizer señaló que en el caso de autos, el despido del querellante estuvo justificado por dos razones: primero, porque transcurrió el año de reserva de empleo y, segundo, porque el querellante no cumplió con los requisitos de reinstalación que establecía la Sec. 3 de la Ley 139, *supra*. Pfizer hizo una analogía con la reserva de empleo en los casos bajo la Ley del Sistema de Compensaciones por Accidentes del Trabajo, Ley 45 de 18 de abril de 1935, 11 L.P.R.A. sec. 1 *et seq.*, basada en la cual el Tribunal Supremo ha resuelto que cuando un empleado se ha reportado al Fondo del Seguro del Estado y el patrono le ha reservado su puesto por el término de doce meses establecido en la ley, se considera justa causa para el despido la cesantía del empleado luego de transcurrido ese término. *Soc. de Gananciales v. Royal Bank de P.R.*, 145 D.P.R. 178 (1998).

Al aplicar la normativa anterior, Pfizer arguyó que el 31 de agosto de 1999, el querellante fue operado de la

rodilla derecha para reparar el ligamento cruzado anterior y éste comenzó a recibir los beneficios de incapacidad a corto plazo (SINOT), por lo que el año de reserva de empleo del querellante comenzó a decursar a partir del 31 de agosto de 1999. Pfizer hizo referencia a que cuando el querellante se reportó a trabajar el 17 de enero de 2000, éste no había sido dado de alta, sino que se había reportado a trabajar con restricciones. Por tal razón, señaló que la solicitud de reinstalación de empleo no cumplía con el requisito de la Ley 139, en cuanto a que al momento de solicitar la reinstalación, el querellante hubiese sido dado de alta.

Pfizer también destacó el hecho de que al querellante se le aprobaron los beneficios de incapacidad a largo plazo, los cuales comenzó a recibir efectivo el 28 de febrero de 2000 y también efectivo ese mes, el querellante comenzó a recibir los beneficios del seguro social. De igual forma, Pfizer resaltó el hecho de que luego del 17 de enero de 2000, el querellante no regresó a la compañía ni se comunicó con nadie, por lo que el querellante agotó la reserva de empleo de SINOT, la cual expiró sin que el querellante ejerciera su derecho a ser reinstalado en su puesto. En virtud de ello, Pfizer señaló que el despido del querellante estuvo justificado, toda vez que se considera como justa causa para el despido, la cesantía del empleado una vez transcurrido el término de un año de la reserva de empleo.

De otro lado, Pfizer indicó que el querellante tampoco cumplió con el requisito establecido en la Ley 139, que requiere que el empleado esté mental y físicamente capacitado para ocupar el empleo en el momento en que le solicita al patrono la reposición en su puesto. Pfizer señaló que al momento en que venció la reserva de empleo, el querellante Pabón Marrero no estaba físicamente capacitado para ocupar su puesto, debido a que estaba recibiendo los beneficios de incapacidad a largo plazo de Pfizer, así como los beneficios del Seguro Social, por lo que Pfizer no estaba obligada a reinstalar al querellante en su trabajo.

Recapitulando, Pfizer sostuvo que el despido del querellante estuvo justificado debido a que Pfizer no tenía obligación alguna de reinstalarlo luego de haber expirado el año de reserva de empleo, al amparo de la Ley 139; que el querellante no cumplió con los requisitos establecidos en la Ley 139 en relación con la reinstalación a su empleo; que la terminación de la relación de empleo activo del querellante con Pfizer estuvo motivada por la solicitud del querellante para recibir los beneficios de incapacidad a largo plazo; y que fueron las propias actuaciones del querellante las que motivaron su cese de empleo en la compañía, por lo que procedía la desestimación por la vía sumaria de la causa de acción por despido injustificado.

Estando pendiente de consideración en el Tribunal de Primera Instancia la solicitud de sentencia sumaria presentada por Pfizer, esta parte presentó una moción suplementaria a la moción de sentencia sumaria. Pfizer señaló que el querellante le había enviado a su representación legal una carta de su médico, Dr. José Suárez Castro, fechada el 4 de febrero de 2002, cuyo contenido podía disponer de la reclamación instada bajo la Ley A. D.A. y la Ley 44, del tribunal *a quo* determinar que las causas de acción presentadas no estaban prescritas. ■

Pfizer argumentó en su moción suplementaria que la causa de acción por discrimen por razón de impedimento al amparo de la Ley A.D.A. y de la Ley 44, no procedían en derecho, debido a que solamente las personas en la clasificación protegida, es decir, aquéllas con incapacidades según definidas por la ley, podían aducir causas de acción a su amparo. A esos efectos, Pfizer señaló que para aducir una causa de acción bajo la Ley A.D.A., un reclamante tiene que establecer un caso *prima facie* de discrimen por razón de incapacidad, para lo cual tiene que cumplir con los siguientes requisitos: (1) tener una incapacidad; (2) ser un individuo cualificado que, con o sin acomodo razonable, es capaz de realizar las funciónes esenciales de su trabajo; y (3) haber sufrido una decisión de empleo adversa por razón de su incapacidad. *Lessard v. Osram Silvana, Inc.*, 175 F.3d 193 (1er Cir. 1999).

De igual forma, Pfizer señaló que una persona que solicite acomodo razonable basándose en la Ley 44, tiene primero que probar que es una persona con impedimento, según definida en la ley y que está cualificada para llevar a cabo las funciones básicas de ese trabajo, con o sin el acomodo razonable. *García v. Darex P.R.,*

*Inc.*, 148 D.P.R. 364, 385-386 (1999).

Pfizer hizo referencia a las definiciones provistas en la Ley 44 y en la Ley A.D.A. A esos efectos, hizo referencia al Art. 1(d) de la Ley 44, 1 L.P.R.A. sec. 501(d), que define *"persona con impedimento"* como toda aquella persona cuyo impedimento *le limite sustancialmente su desempeño en una o más actividades del diario vivir*; que la persona tenga un historial previo de esa condición o se le considere como que tiene dicho impedimento aun cuando no lo tiene. Por su parte, la Ley A.D.A. define el término *disability* respecto a una persona como: (A) *a physical or mental impairment that substantially limits one or more of the major life activities of such individual;* (B) *a record of such an impairment; or* (C) *being regarded as having such an impairment.* 42 U.S.C. sec. 12102. Pfizer destacó que ambas leyes definían el término de forma similar, pero hacían la salvedad de que el elemento rector del impedimento era que éste *limitara sustancialmente* una actividad de la vida cotidiana.

Pfizer señaló que un impedimento de por sí no era necesariamente una incapacidad que activaba la protección de la ley y que para que un demandante pudiese aducir una causa de acción bajo la Ley A.D.A. y la Ley 44, tenía que demostrar que poseía un impedimento y que ese impedimento le limitaba sustancialmente realizar una de las actividades mayores de la vida. Pfizer se basó en *Toyota Motors v. Williams*, 534 U.S. 184 (2002), y señaló que ese caso había identificado tres elementos que un demandante tiene que probar para poder prevalecer: (1) que la persona sufre de un impedimento físico o mental según definido en la ley; (2) que su impedimento limita una actividad mayor de la vida; y (3) que esa limitación de su actividad mayor de la vida es sustancial. *Id.*, págs. 194-195.

En cuanto a la interpretación de lo que significa una limitación *"sustancial"*, Pfizer señaló que se excluían impedimentos que interfieren en forma menor (*in a minor way*) con el desempeño de trabajos manuales. *Toyota Motors v. Williams, supra*, pág. 197. Asimismo, al interpretarse lo que significa una actividad *"mayor"*, se estableció que ese término se refería a actividades que son de central importancia para la vida diaria. *Id.* Por otro lado, Pfizer hizo referencia al reglamento federal que define *"actividades mayores de la vida"* como funciones tales como poder sostenerse uno mismo, llevar a cabo tareas manuales, ver, oír, hablar, respirar, aprender, caminar y trabajar. 29 C.F.R. sec. 1630.2(i).

Pfizer también señaló que para determinar si un individuo está *"sustancialmente"* limitado para realizar una de las actividades principales de la vida, es necesario considerar los siguientes factores: (1) la naturaleza y la severidad del impedimento; (2) la duración del impedimento; y (3) el impacto permanente o a largo plazo resultante del impedimento. 29 C.F.R. sec. 1630.2(j)(2). Por tal razón, para cumplir con el requisito de que una condición limita sustancialmente una tarea básica, el demandante tiene que probar que tiene un impedimento que le impide o severamente restringe realizar actividades que son de central importancia a la vida diaria de la mayoría de las personas. Por ello, no es suficiente que un demandante intente probar su condición de incapacidad meramente presentando evidencia por medio de diagnósticos médicos, sino que se requiere que someta prueba sobre el alcance de la limitación causada por el impedimento y que tiene un efecto sustancial en su vida. *Toyota Motors v. Williams*, supra, pág. 198.

Pfizer también enfatizó que cuando un tribunal tiene que determinar si una incapacidad o impedimento afecta el desempeño de una tarea manual de una actividad mayor de la vida, es necesario determinar si el afectado no puede realizar una variedad de tareas centrales a la vida diaria de la mayoría de las personas, análisis que es diferente al análisis de examinar si el afectado no puede realizar tareas asociadas con su trabajo en específico; y que las tareas manuales particulares a una posición no necesariamente son parte de la vida de la mayoría de las personas. *Toyota Motors v. Williams, supra*, pág. 201.

Pfizer también señaló en su moción que las condiciones de salud transitorias que no dejan efectos permanentes no son impedimentos al amparo de la ley. *Kenneth Rakestraw v. Carpenter Company*, 898 F.Supp.

386, 389-390 (N.D. Miss. 1995). Pfizer también hizo referencia a lo resuelto en *Dodgens v. Kent Mfg Co.*, 955 F.Supp. 560 (D.S.C. 1997), en que se determinó que una lesión de rodilla no le creaba un impedimento a un ex empleado —a pesar de la contención del empleado de que los efectos de tal lesión limitaban sustancialmente la actividad de caminar—, toda vez que su grado de incapacidad era sólo del 15% y el empleado podía caminar sustancialmente de la misma forma que una persona promedio.

Pfizer también aludió a *Hites v. Patriot Homes Co.*, 904 F.Supp. 880 (N.D. Ind. 1995), en el que se resolvió que la lesión de la rodilla del demandante no era una incapacidad bajo la Ley A.D.A., en vista de que la lesión no lo limitaba sustancialmente en ninguna actividad principal. Asimismo, Pfizer citó a *Blanton v. Winston Printing, Co.*, 868 F.Supp. 804 (M.D.N.C. 1994), en el que un ex empleado no logró probar que su lesión de rodilla era una incapacidad bajo los términos de la Ley A.D.A., debido a que aun asumiendo que la lesión le impedía llevar a cabo alguna actividad principal, la lesión era de duración relativamente corta y la inhabilidad del demandante para correr rápidamente o subir escaleras no constituia un efecto residual suficiente como para que se considerara una incapacidad.

Otra jurisprudencia a que hizo referencia Pfizer dictaminó que las lesiones severas que sufrió un demandante en ambas rodillas le causaron sólo una incapacidad temporera para trabajar que no constituia un impedimento bajo los términos del estatuto. *Fagan v. United Intern. Ins. Co.*, 128 F.Supp.2d 182 (S.D.N.Y. 2001); y un técnico de farmacia no era una persona cualificada con una incapacidad según la Ley A.D.A., a pesar de que por razón de las restricciones médicas que resultaron de ciertas lesiones sufridas en la rodilla y en la pierna, éste no podía hacer entregas de medicinas con o sin acomodo. *Basith v. Cook County*, 241 F.3d 919 (7mo Cir. 2001).

Luego de ilustrar al Tribunal de Primera Instancia en cuanto a la jurisprudencia sobre la materia, Pfizer adujo que en el caso de autos, la condición del querellante no limitaba sus actividades mayores de la vida cotidiana; que esto surgía del hecho de que el querellante había admitido que para enero de 2000, luego de escasamente cuatro meses a partir de la cirugía de la rodilla, éste podía hacer todas las funciones principales de su vida, incluyendo guiar y asearse; que la única actividad mayor de la vida cotidiana que el querellante no podía realizar era reparar la máquina conocida como *casepacket*, porque tenía que doblarse y meterse debajo para hacer la reparación que fuese necesaria y mientras esa máquina estuviese funcionando y no se rompiera, el querellante no intervenía con ella; que el hecho de que el querellante no pudiese realizar únicamente la tarea de reparar la referida máquina mientras podía desempeñar sus demás funciones como mecánico, no era suficiente para constituir un impedimento bajo la Ley A.D.A. o la Ley 44, ya que se limitaba a una tarea en particular y no a una gama de empleos. Asimismo, Pfizer destacó que el querellante controlaba los dolores de la rodilla con pastillas y que ese hecho es un factor mitigante en cuanto a si la condición es una incapacidad protegida bajo la Ley 44 y la Ley A.D.A. En virtud de lo anterior, Pfizer señaló que había que concluir que las actividades mayores de la vida cotidiana del querellante no se habían visto afectadas significativamente.

El querellante Pabón Marrero se opuso a la solicitud de sentencia sumaria y adujo que existía controversia sobre hechos pertinentes que debían dilucidarse en un juicio. Éste también señaló que cumplía con los requisitos de la Ley A.D.A., la Ley 44 y la Ley 80.

En cuanto a la contención de que las acciones estaban prescritas, el querellante adujo que la decisión de no permitírsele seguir trabajando no se tomó el 17 de enero de 2000, ya que cuando el querellante se reportó a trabajar en esa fecha, no se tomó decisión alguna sobre la continuación, terminación o permanencia en el empleo del querellante. El querellante señaló que, por el contrario, en esa ocasión al querellante no se le pudo acomodar en sus funciones, ya que las restricciones emitidas por su médico eran generales y no le permitían a la compañía evaluarlas de conformidad con los deberes y responsabilidades del puesto del querellante.

Asimismo, el querellante Pabón Marrero hizo referencia a la contestación al interrogatorio hecho por Pfizer

en el que esa compañía indicó que al querellante no se le había podido acomodar el 17 de enero de 2000, ya que de conformidad con los procesos y políticas de la compañía, el curso a seguir en ese momento era referirlo al dispensario y luego al Comité de Tarea Modificada. El querellante adujo que lo anterior era indicativo de que posterior al 17 de enero de 2000, Pfizer venía obligada a llevar a cabo un proceso para evaluar si le proveía o no acomodo razonable al querellante Pabón Marrero.

El querellante también indicó que durante todo el tiempo en que estuvo sin trabajar, se mantuvo reportándose y siendo evaluado por el médico de la compañía, Dr. Roberto López Nieves; que tanto él como su esposa tuvieron varias conversaciones telefónicas posterior al 28 de febrero de 2001 con el señor Evaristo Rivera, representante de MCS, quien les informó que durante julio y octubre de 2000, él había hecho gestiones para que Pfizer le proveyera acomodo razonable al querellante, pero que la compañía se negó a proveerlo.

El querellante Pabón Marrero también rebatió lo alegado por Pfizer respecto a que el médico del querellante no había sometido la información requerida sobre el período de duración de las restricciones. A esos efectos, el querellante hizo referencia al certificado médico expedido por el Dr. Suárez Castro para sostener que ese médico efectivamente había sometido la información que se le había requerido. ■ El querellante señaló que, en virtud de dicho certificado médico, Pfizer estaba en posición de tomar una decisión sobre el acomodo razonable del querellante luego del 24 de febrero de 2000; que, sin embargo, Pfizer optó por mantener en suspenso al querellante y éste continuó extendiendo su período de enfermedad mediante los correspondientes certificados médicos hasta el 5 de mayo de 2000; y que, por tal razón, la decisión de Pfizer de no permitirle a Pabón Marrero continuar trabajando se llevó a cabo posteriormente al 1 de marzo de 2000, fecha en que el Dr. López Nieves acusó recibo del certificado médico del Dr. Suárez Castro.

El querellante también señaló que el señor Evaristo Rivera le pidió a Pfizer acomodo razonable para el querellante el 9 de octubre de 2000 y que en el informe de consulta emitido por el Dr. José Ocasio, éste señaló que la fecha en que el querellante Pabón Marrero perdió su empleo fue en agosto de 2000. Asimismo, el querellante también se refirió al Reporte de Consulta emitido por la Dra. Vivian Charneco, del cual surgía que el querellante había llamado por teléfono a MCS y había indicado que deseaba regresar al trabajo, pero que la compañía no aceptaba darle acomodo razonable.

Por otro lado, el querellante señaló que el hecho de que él hubiese indicado en la querella ante la Unidad Anti Discrimen que el último acto discriminatorio había ocurrido el 17 de enero de 2000, eso no era determinante en cuanto a la prescripción, ya que aunque el querellante entendió que ése fue el día en que se efectuó el último acto discriminatorio tangible en contra suya, éste indicó que hubo actos continuos de discrimen como parte de la negativa de Pfizer a proveerle acomodo razonable al querellante. Por tal razón, el querellante señaló que la demanda fue radicada el 20 de febrero de 2001 y, como tal, dentro del período de un año en que se cometió el último acto discriminatorio.

De igual forma, el querellante Pabón Marrero adujo que hubo actos discriminatorios el 17 de enero, el 9 de octubre y el 13 de junio de 2000, basados en los tres Reportes de Consulta emitidos por MCS, así como también actos discriminatorios posteriores al 1 de marzo de 2001, cuando Pfizer recibió las especificaciones sobre la duración de las restricciones.

Por otro lado, el querellante también rebatió el argumento de Pfizer de que éste no tenía derecho a ser reinstalado en su empleo luego de haber permanecido en licencia bajo los beneficios de SINOT y que había expirado el término de un año de reserva de empleo. A esos efectos, el querellante señaló que él fue operado el 30 de agosto de 1999 y solicitó reinstalación el 17 de enero de 2000, cumpliendo así con los requisitos de la Ley 139, ya que cuando solicitó reinstalación estaba mental y físicamente capacitado para ocupar su puesto y sólo necesitaba ciertas modificaciones a sus tareas contenidas en la hoja de descripción de tareas; que él estaba apto para regresar a su trabajo el 17 de enero de 2000 y que por eso fue que su ortopeda le proveyó un certificado

médico que establecía modificaciones a sus tareas y por eso fue que también el Dr. López Nieves le indicó que estaba capacitado para trabajar con modificaciones, luego de evaluarlo el 17 de enero de 2000.

En su oposición, el querellante también indicó que la doctrina, de actos continuos de discrimen le aplicaba a la reclamación al amparo de la Ley 44; que bajo esa doctrina el término prescriptivo no comenzaba a decursar sino hasta que se cometía el último acto discriminatorio; y que el último acto discriminatorio en el caso de autos se había cometido dentro del término de prescripción —pero no especificó la fecha—, por lo que la causa de acción instada al amparo de la Ley 44 no estaba prescrita.

Asimismo, el querellante indicó que la doctrina de agotar remedios administrativos constituia una defensa que el patrono podía interponer, pero que ésta tenía excepciones. █

Por otro lado, el querellante también adujo en su oposición a sentencia sumaria que un demandante tenía 90 días desde el recibo de la carta de autorización para litigar, emitida por la E.E.O.C. para hacer valer su derecho al amparo del Título VII, 42 U.S.C. sec. 2000e(5)(f)(1); que dicho período de 90 días comenzaba a decursar cuando el demandado recibía la notificación; y que en el caso de autos, la E.E.O.C. emitió la carta de autorización para litigar el 11 de abril de 2001, por lo que la reclamación del querellante no estaba prescrita, debido a que su querella ante la Unidad Anti Discrimen interrumpió el término.

Otro argumento esbozado por el querellante para sostener su oposición a la solicitud de sentencia sumaria era que éste cumplía con los requisitos de la Ley A.D.A. porque tenía una condición que limitaba sus actividades principales de la vida diaria, existía un récord sobre dicho impedimento y era reconocido como una persona que tenía tal impedimento. El querellante también señaló que él estaba cualificado bajo la Ley A.D.A. porque podía desempeñar las tareas esenciales de su puesto con un acomodo razonable.

El querellante Pabón Marrero también señaló que existían controversias de hechos que le impedían al Tribunal de Primera Instancia dictar sentencia sumaria. Una de las controversias era si Pfizer se había negado a proveerle acomodo razonable a éste, puesto que el querellante alegaba esta cuestión en la afirmativa y Pfizer lo negaba. Otra controversia de hechos alegada por el querellante era si su médico, Dr. Suárez Castro, le había provisto a Pfizer la información sobre la duración de las restricciones del querellante, ya que el querellante aducía que sí y Pfizer alegaba que no. El querellante añadió que la compañía no había actuado de buena fe y había interrumpido el proceso interactivo para determinar el acomodo razonable que el querellante necesitaba.

Respecto a la causa de acción por despido injustificado, el querellante rebatió lo aseverado por Pfizer en cuanto a que el despido estuvo justificado debido a que el querellante no podía ser reinstalado porque no estaba apto para ocupar su posición. A esos efectos, el querellante señaló que el 17 de enero de 2000, él estaba capacitado para ocupar su posición y que así lo había certificado tanto su médico, Dr. Suárez Castro, como el médico de la compañía, Dr. López Nieves, por lo que la negativa de Pfizer de no permitirle al querellante continuar trabajando fue una actuación ilegal, arbitraria y caprichosa y constituia un despido injustificado.

El Tribunal de Primera Instancia acogió la solicitud de Pfizer y dictó sentencia sumaria en la que desestimó tanto las causas de acción por discrimen por razón de impedimento como la causa de acción por despido injustificado. Al así resolver, dicho foro enumeró los elementos de la causa de acción por discrimen por razón de impedimento, a saber: (1) que el demandante esté incapacitado; (2) que esté cualificado para realizar las funciones esenciales del empleo con o sin acomodo razonable; y (3) que haya sido objeto de una decisión de empleo adversa por razón del impedimento. *Soto-Ocasio v. Federal Exp. Corp.*, 150 F.3d 14 (1r Cir. 1998). A su vez, el tribunal *a quo* definió como persona incapacitada cualificada a aquélla que tenga algún impedimento de naturaleza motora, mental o sensorial que le obstaculice o limite su inicio o desempeño laboral, de estudios o para el disfrute pleno de la vida y que esté cualificada para llevar a cabo las funciones básicas de ese trabajo o área de estudio con o sin acomodo razonable. 1 L.P.R.A. sec. 501(d) y (e) y 42 U.S.C. sec. 12102(2) y sec.

12111(8).

En virtud de lo anterior, el tribunal sentenciador determinó que una persona que recibe beneficios por una incapacidad basada en su inhabilidad para trabajar, no es una persona cualificada bajo la Ley A.D.A. No obstante, dicho foro señaló que esa persona podría rebatir la presunción de que no estaba cualificada durante el período en que alega se le negó acomodo razonable, mediante la presentación de evidencia que demuestre que efectivamente estaba cualificada para realizar las funciones básicas de su empleo.

Luego de examinar si el querellante era una persona incapacitada cualificada, el Tribunal de Primera Instancia concluyó que no. El tribunal *a quo* señaló que el empleado Pabón Marrero presentó una reclamación de beneficios por incapacidad a largo plazo a la compañía aseguradora de Pfizer y a la Administración del Seguro Social; que ambas solicitudes fueron aprobadas con beneficios pagaderos a partir de febrero de 2000, por lo que el querellante estaba incapacitado para trabajar; y que el querellante no demostró que estuviera cualificado cuando intentó reintegrarse a su empleo el 17 de enero de 2000.

El tribunal *a quo* también señaló que cuando el querellante se reportó a trabajar el 17 de enero de 2000, éste no pudo ser reinstalado en su posición debido a sus restricciones médicas; que se refirió al querellante al ortopeda para que éste proveyera información más específica con el fin de evaluar la posibilidad de colocarlo en otra posición temporeramente o ajustar las funciones que realizaba, pero la información nunca fue provista; y que el médico del querellante emitió varias certificaciones médicas en las que indicó que el querellante no podía regresar a trabajar hasta el 5 de mayo de 2000. Ante tales circunstancias, el Tribunal de Primera Instancia concluyó que el querellante Pabón Marrero no estaba cualificado para realizar las funciones básicas de su empleo y que en el supuesto de que hubiese estado cualificado para ocupar su empleo, resultaba improcedente imponerle responsabilidad a Pfizer por no haberle provisto acomodo razonable, ya que el querellante no proveyó la información necesaria para que la compañía evaluara esa posibilidad, deteniendo así el proceso interactivo entre patrono y empleado.

El Tribunal de Primera Instancia expresó que para fijarle responsabilidad a un patrono por no haber provisto acomodo razonable, el empleado tiene la obligación inicial de notificarle sobre su incapacidad y sobre la necesidad del acomodo razonable y una vez el empleado ha hecho esto, el patrono viene obligado a iniciar un proceso interactivo con dicho empleado para analizar la posibilidad y la forma de conceder el remedio solicitado. A esos fines, el patrono puede solicitar la información que considere necesaria para realizar la acción de acomodo razonable solicitada. Por su parte, el empleado debe proveer la información requerida y, de no hacerlo, no podrá imponérsele responsabilidad al patrono por negarse a proveer acomodo razonable.

El tribunal sentenciador también desestimó la causa de acción por despido injustificado. Al así resolver, el tribunal *a quo* señaló que la Ley 139, *supra*, establecía un seguro por incapacidad temporal para indemnizar a los trabajadores por la pérdida de salarios resultante de una incapacidad debida a enfermedad o a accidentes no relacionados con el empleo; que esa disposición obligaba a los patronos a reservar el empleo que desempeñaba el trabajador al momento de comenzar la incapacidad y a reinstalarlo en el empleo sujeto a que: (1) el empleado solicite la reinstalación dentro de los quince días de haber sido dado de alta; (2) que la solicitud se haga dentro del año del comienzo de la incapacidad; (3) que el empleado esté mental y físicamente capacitado para ocupar la posición; y (4) que la posición esté disponible.

Luego de evaluar esos requisitos, el tribunal *a quo* determinó que el querellante Pabón Marrero no había cumplido con los requisitos de la Ley 139; que éste había comenzado a recibir los beneficios por incapacidad a corto plazo el 30 de agosto de 1999 y cuando solicitó la reinsalación en el empleo el 17 de enero de 2000, el querellante no había sido dado de alta, sino que tenía unas restricciones médicas, por lo que no estaba capacitado para ocupar su puesto en ese momento; que la reserva de empleo expiró en agosto de 2001 sin que el querellante demostrara estar capacitado para ocupar su plaza, sino que, por el contrario, para esa fecha él ya

estaba recibiendo los beneficios por incapacidad a largo plazo de la compañía y del Seguro Social. El foro sentenciador dictaminó que, ante tales circunstancias, Pfizer no estaba obligada a reinstalar al querellante en el empleo, por lo que éste no fue objeto de un despido injustificado.

Inconforme con dicho dictamen, el querellante Pabón Marrero apeló ante nos y adujo la comisión de tres errores por parte del Tribunal de Primera Instancia; (1) al determinar que el querellante no era una persona con impedimento y concluir que el querellante no demostró estar cualificado cuando intentó reintegrarse al trabajo; (2) al desestimar las acciones al amparo de la Ley 80; y (3) al no declarar con lugar la solicitud de anotación de rebeldía.

En el primer error señalado, el querellante aduce que el Tribunal de Primera Instancia erró al determinar que él no era una persona con impedimento y al concluir que éste no había demostrado estar cualificado cuando intentó integrarse al trabajo. No tiene razón. Veamos.

Actualmente, en Puerto Rico, una persona con impedimentos posee dos remedios contra actuaciones discriminatorias de un patrono: uno estatal y otro federal. El remedio federal está contenido en la Ley A.D.A., mientras que el remedio estatal lo provee la Ley 44, *supra. Rivera Flores v. Cía. ABC*, 138 D.P.R. 1, 5 (1995).

La Ley 44 de 2 de julio de 1985, 1 L.P.R.A. sec. 501 *et seq.*, fue aprobada con el fin de proteger a las personas con impedimentos físicos o mentales, para ampliar sus oportunidades de empleo y prohibir el discrimen en empleo contra tales personas. El 26 de julio de 1990, se aprobó la *Americans with Disabilities Act* (Ley A.D.A.), 42 U.S.C. sec. 12101 *et seq.* Ese estatuto estableció la obligación de todo patrono de proveer acomodo razonable en el lugar de trabajo a las personas con impedimentos. Poco después de la aprobación de la Ley A.D.A., se enmendó la Ley 44 para atemperar nuestra legislación con la Ley A.D.A. Ley 105 de 20 de diciembre de 1991. *García v. Darex P.R., Inc., supra*, pág. 385.

El Tribunal de Primera Instancia concluyó que el querellante no cualificaba como una persona impedida, según la definición provista por el Art. 1(d) de la Ley 44, puesto que el querellante no tenía un impedimento de naturaleza motora, mental o sensorial.

El Art. 1(d) de la Ley 44, 1 L.P.R.A. sec. 501(d), define a una persona con impedimentos físicos, mentales o sensoriales como sigue:

*"Toda persona con un impedimento de naturaleza motora, mental o sensorial, que le obstaculice o limite su inicio o desempeño laboral, de estudios o para el disfrute pleno de la vida y que está cualificada para llevar a cabo las funciones básicas de ese trabajo o área de estudio, con o sin acomodo razonable.*

*Se entenderá, además, que es una persona con impedimentos bajo la protección de este capítulo, toda aquella persona cuyo impedimento le limite sustancialmente su desempeño en una o más actividades principales del diario vivir; que la persona tenga un historial previo de esa condición o se le considere como que tiene dicho impedimento aun cuando no lo tiene.*

*Para los propósitos de este capítulo, se considerará como impedimento sensorial aqu[é]l que afecte sustancialmente, la audición, visión, tacto, olfato y el habla. ...".*

Por su parte, la Ley A.D.A. define *"incapacidad"* (*disability*) en términos de un individuo como un impedimento físico o mental que limita sustancialmente una o más de las actividades mayores de la vida de un individuo; debe existir un récord de dicho impedimento o la persona debe ser reconocida como que tiene tal impedimento, 42 U.S.C. sec. 12102(2).

Bajo la Ley A.D.A., no todos los impedimentos están protegidos, sino sólo aquéllos que limiten sustancialemnte una actividad mayor de la vida. *Lessard v. Osram Silvana, Inc., supra*, pág. 197. En el caso de autos, el querellante no. tenía un impedimento, ya que no surge que la condición del querellante le impida realizar las actividades mayores de la vida, como cuidar de sí mismo, realizar tareas manuales, caminar, ver, oír, hablar, respirar, aprender o trabajar. *Dodgens v. Kent Mfg. Co.*, supra.

Existe una diferencia entre la incapacidad para realizar una clase de trabajo o una amplia gama de trabajos —lo que da base para una determinación de incapacidad—, y la incapacidad para realizar un trabajo en particular, la cual no se considera como una incapacidad. 29 C.F.R. sec. 1630.2(j)(3)(i). La inhabilidad para realizar un trabajo en particular no constituye una limitación sustancial en la actividad mayor de la vida que es trabajar. *Lessard v. Osram Silvana, Inc., supra*, pág. 197. La razón para hacer esta distinción se basa en la noción de que no existe una incapacidad, a menos que la actividad mayor de la vida consistente en trabajar esté menoscabada o perjudicada. *Id.*

En el caso de autos, el querellante no cualificaba como una persona incapacitada bajo la Ley A.D.A. y la Ley 44, debido a que no estaba incapacitado en cuanto a la actividad mayor de la vida consistente en trabajar, ya que aunque éste no podía realizar una tarea en su trabajo como mecánico, no estaba impedido de realizar otros tipos de trabajos. El querellante Pabón Marrero admitió que podía ejercer muchas de las funciones de su puesto de mecánico y que la única función que no podía realizar era la de reparar la máquina *casepacket*, porque era la máquina más difícil y bajita. *Apéndice del apelante*, pág. 143.

Por otro lado, el hecho de que el querellante Pabón Marrero no pudiera realizar las tareas completas para desempeñar sus funciones como mecánico, conforme le representó al seguro de incapacidad a largo plazo y a la Administración del Seguro Social, no es suficiente para constituir un impedimento bajo la Ley A.D.A. o la Ley 44, ya que su limitación no afectó una actividad mayor de la vida y se limitó a un empleo en particular y no a una gama de empleos. También hay que destacar el hecho de que el querellante admitió que los dolores de la rodilla, luego de la operación, los controlaba con pastillas.

De igual forma, la incapacidad del querellante no limita sus actividades mayores de la vida cotidiana, debido a que el querellante admitió que podía hacerlo todo, incluyendo guiar y asearse. *Apéndice del apelante*, pág. 143A.

En virtud de lo anterior, puede concluirse que las actividades mayores de la vida cotidiana del querellante, según las admisiones hechas por éste, no se han visto afectadas sustancialmente y que la condición del querellante no es severa ni permanente, a tenor con las admisiones hechas por el ortopeda del querellante, Dr. Suárez Castro, en cuanto a que había respondido muy bien a la rehabilitación y había conseguido el arco de movimiento de su rodilla prácticamente completo. Asimismo, hay que tomar en cuenta que el porcentaje de incapacidad que presenta el querellante es de 10% en sus funciones generales y que esa limitación no constituye una incapacidad para propósitos de la Ley A.D.A. y la Ley 44. *Dodgens v. Kent Mfg. Co., supra*, pág. 564.

El Tribunal de Primera Instancia tampoco erró al concluir que el querellante no demostró estar cualificado cuando intentó reintegrarse a su trabajo. Si bien el querellante Pabón Marrero aduce que estaba capacitado para ocupar su posición cuando se reportó a trabajar el 17 de enero de 2000, la realidad es que éste no estaba capacitado para desempeñar las tareas esenciales de su puesto. Esa determinación quedó demostrada por el hecho de que, luego del ortopeda del querellante haber emitido el primer certificado médico que le imponía restricciones al querellante para desempeñar su trabajo, tanto este facultativo como el médico de Pfizer siguieron emitiendo certificados médicos y evaluaciones que aplazaban el regreso del querellante a su trabajo hasta mayo de 2000.

Por otro lado, Pfizer, como patrono, es quien puede determinar cuáles son las funciones básicas del puesto

de mecánica que desempeñaba el querellante. En el caso de autos, la decisión de no permitirle al querellante reintegrarse a su trabajo por éste no poder realizar las funciones básicas del puesto fue una decisión tomada por la compañía, luego de haberse discutido con el supervisor inmediato del querellante, señor Freddie Vázquez, con el gerente del Departamento de Ingeniería, señor Manuel Medina, y con la directora de Recursos Humanos. Además, esa decisión de los supervisores de no permitir que el querellante se reinstalara a su trabajo fue avalada tanto por el médico de Pfizer como por el ortopeda del querellante, al ambos facultativos aplazar durante meses el período de regreso al trabajo del querellante.

Finalmente, el Tribunal de Primera Instancia también determinó que el querellante no le sometió a Pfizer la información solicitada para que la compañía estuviera en posición de establecer qué acomodo le permitiría al querellante realizar las funciones de su trabajo. Si examinamos el certificado médico emitido por el ortopeda del querellante, doctor Suárez Castro, al médico de Pfizer, doctor López Nieves, surge que la información provista en ese certificado distaba mucho de especificar qué funciones podía realizar el querellante. El certificado médico en cuestión sólo se limitaba a señalar que el querellante podía regresar a su trabajo a los seis meses con ciertas restricciones. Esa información no era suficiente para que Pfizer pudiera proveerle al querellante un acomodo razonable.

A tenor con lo anterior, resolvemos que este primer error señalado no se cometió.

En el segundo señalamiento de error, el querellante se queja de que el Tribunal de Primera Instancia desestimó la acción por despido injustificado. A esos efectos, esa parte rebate lo aseverado por Pfizer de que el querellante no podía ser reinstalado a su puesto, debido a que no estaba apto para ocupar su posición. El querellante indica que al 17 de enero de 2000, él estaba capacitado para ocupar su posición y así lo certificó su facultativo médico, Dr. Suárez Castro, y el médico de Pfizer, Dr. López Nieves, por lo que la negativa de la compañía de permitirle continuar trabajando fue ilegal, arbitraria y caprichosa y, por ende, constituyó un despido injustificado. Finalmente, el querellante Pabón Marrero indica que los hechos esenciales para determinar si medió justa causa en su despido están en controversia, máxime cuando Pfizer alegó que no lo había despedido, por lo que el tribunal *a quo* erró al desestimar esta causa de acción.

Pfizer rebate este señalamiento y aduce que el despido estuvo justificado debido a que expiró el período de un año de reserva de empleo antes de que el querellante estuviera capacitado para trabajar y éste no había sido dado de alta cuando se presentó a trabajar con restricciones, por lo que no cumplía con los requisitos establecidos en la Ley 139 para solicitar la reinstalación en el empleo luego de haber estado bajo una licencia de beneficio bajo S.I.N.O.T. Pfizer tiene razón.

La Ley de Beneficios por Incapacidad Temporal, Ley 139, *supra*, establece un seguro para cubrir el riesgo por incapacidad no ocupacional, el cual provee determinados beneficios monetarios para atenuar la pérdida de salarios cuando un obrero no puede desempeñar los deberes de su empleo por padecer de una inhabilidad para ello causada por una lesión o enfermedad que no está relacionada con el empleo. *Meléndez v. Asoc. Hosp. del Maestro*, 156 D.P.R. ___ (2002), **2002 J.T.S. 66**.

Al amparo de esa ley, también se establece una reserva de empleo para el obrero incapacitado que cualifique. El patrono viene obligado a reservar el empleo que desempeñe el trabajador al momento de comenzar la incapacidad y a reinstalarlo en el trabajo, si se cumplen las siguientes tres condiciones: (1) que el trabajador le requiera al patrono que lo reponga en su empleo dentro del término de quince días desde que fuera dado de alta y de un año desde la fecha en que comenzó la incapacidad; (2) que el trabajador esté mental y físicamente capacitado para ocupar el empleo en el momento en que solicite su reposición al patrono; y (3) que el referido empleo subsista al momento en que el trabajador solicite su reposición.

Concurrimos con lo resuelto por el tribunal *a quo* en cuanto a que el querellante no cumplió con los

requisitos para la reinstalación a su empleo establecidos en la Sec. 3 de la Ley 139, *supra*. En primer lugar, el querellante no había sido dado de alta cuando se presentó a trabajar el 17 de enero de 2000. Este hecho surge de los certificados médicos emitidos por el ortopeda del querellante, doctor Suárez Castro. En segundo lugar, el querellante se presentó a trabajar con una serie de restricciones médicas que sus supervisores determinaron le impedían realizar su trabajo, por lo que éste no cumplía con el requisito de estar física y mentalmente capacitado para realizar su trabajo. Tanto es así, que transcurrieron varios meses y el ortopeda del querellante no lo dio de alta, por lo que el querellante tuvo que continuar bajo los beneficios del seguro de Pfizer y el seguro social. En tercer lugar, la reserva de empleo de un año expiró en agosto de 2001, fecha en que el querellante estaba recibiendo los beneficios de incapacidad a largo plazo de la compañía y del seguro social. Ante el incumplimiento del querellante con los requisitos establecidos en la Sec. 3 de la Ley 19, éste no cualificaba para una reinstalación en su empleo y Pfizer podía disponer entonces de su puesto, sin que ese hecho constituyera un despido injustificado.

En virtud de lo anterior, resolvemos que este segundo error señalado no se cometió.

En el tercer señalamiento de error, el querellante aduce que el Tribunal de Primera Instancia erró al no declarar con lugar la solicitud de anotación de rebeldía. Para sostener este error, el querellante indica que la querella fue presentada el 20 de febrero de 2001 y que Pfizer fue emplazada el 30 de marzo de 2001; que el 6 de abril de 2001, Pfizer presentó una moción de prórroga para contestar la querella y radicó su contestación el 19 de abril de 2001; y que el tribunal *a quo* emitió una orden el 9 de mayo de 2001 en la que denegó la solicitud de prórroga.

El querellante hace referencia a las Secs. 3 y 4 de la Ley 2, 32 L.P.R.A. sec. 3120 y 3121, que establecen como sigue:

*"El secretario del tribunal notificará a la parte querellada con copia de la querella, apercibiéndole que deberá radicar su contestación por escrito, con constancia de haber servido copia de la misma al abogado de la parte querellante o a ésta si hubiere comparecido por derecho propio, dentro de diez (10) días después de la notificación, si ésta se hiciere en el distrito judicial en que se promueve la acción y dentro de quince (15) días en los demás casos, y apercibiéndole, además, que si así no lo hiciere, se dictará sentencia en su contra, concediendo el remedio solicitado, sin más citarle ni oírle. Solamente a moción de la parte querellada, la cual deberá notificarse al abogado de la parte querellante o a ésta si compareciere por derecho propio, en que se expongan bajo juramento los motivos que para ello tuviere la parte querellada, podrá el juez, si de la faz de la moción encontrara causa justificada, prorrogar el término para contestar. En ningún otro caso tendrá jurisdicción el tribunal para conceder esa prórroga.*

*Si el querellado no radicara su contestación a la querella en la forma y el término dispuesto en la Sec. 3120 de este título, el juez dictará sentencia contra el querellado, a instancias del querellante, concediendo el remedio solicitado. En este caso, dicha sentencia será final y de la misma no podrá apelarse."* (Énfasis nuestro.)

Luego de hacer referencia a estas disposiciones de ley, el querellante indica que los tribunales tienen el deber de darle estricto cumplimiento al procedimiento sumario de la Ley 2 y carecen de jurisdicción para conceder prórrogas en casos en que no se cumpla con lo ordenado; que es un mandato legislativo que generalmente no está sujeto a la discreción del tribunal; y que las circunstancias especiales que requieren alguna flexibilidad no pueden ser utilizadas para soslayar o subvertir el precepto de rapidez en el trámite judicial contenido en la Ley 2. *Mercado Cintrón v. Zeta Com., Inc.*, 135 D.P.R. 737, 742 (1994).

El querellante también señaló que pueden existir circunstancias especiales que requieran alguna flexibilidad, como cuando surgen del expediente las causas que justifican la dilación en la radicación de la contestación a una querella, en que el tribunal puede discrecionalmente conceder una extensión al término para la contestación de la

El querellante además indicó que el incumplimiento con el término de diez días para contestar la querella exige que el tribunal conceda el remedio solicitado por la parte querellante, a menos que dentro de ese término la parte querellada presente una solicitud de prórroga juramentada en la que exponga los hechos que la justifican.

El querellante indica que en el caso de autos, el Tribunal de Primera Instancia emitió una orden el 9 de mayo de 2001 en la que denegó la solicitud de prórroga radicada por Pfizer. Por tal razón, debido a que Pfizer no contestó la querella dentro del término de diez días dispuesto en la Ley 2 y debido a que el tribunal *a quo* denegó la solicitud de prórroga, procedía que el tribunal le anotara la rebeldía. No tiene razón.

En el caso de autos, la querella fue presentada el 20 de febrero de 2001 y Pfizer fue emplazada el siguiente 30 de marzo, por lo que la compañía debía presentar su contestación a la querella o solicitar prórroga dentro de un plazo de diez días luego de haber sido emplazada. Pfizer presentó una moción de prórroga debidamente jurada el 6 de abril de 2001, antes de que venciera el término de los diez días para contestar.

En su solicitud de prórroga, Pfizer adujo que la querella giraba en torno a reclamaciones por despido injustificado y discrimen por razón de impedimento bajo leyes locales y federales, así como una reclamación de daños y perjuicios bajo el Art. 1802 del Código Civil, *supra*; que el querellante también reclamaba la reinstalación de empleo, salarios dejados de percibir y daños y angustias mentales, lo cual podía excluir el caso del procedimiento sumario contemplado en la Ley 2; que para poder contestar adecuadamente y de forma responsable la querella, era necesario llevar a cabo una investigación de los hechos alegados que incluía el estudio de documentos, tales como expedientes médicos y de personal del querellante, así como entrevistar empleados y supervisores de la compañía, por lo que solicitaba un término razonable para llevar a cabo la investigación y poder hacer una alegación responsiva y responsable.

El querellante Pabón Marrero no presentó oposición a la solicitud de prórroga y no es sino hasta pasados trece meses que solicitó la anotación de rebeldía. La contestación a la querella fue presentada el 19 de abril de 2001, mientras que la moción para solicitar la anotación de rebeldía fue radicada el 29 de mayo de 2002. La Regla 8.4 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 8.4, provee un plazo de diez días, contados a partir de la notificación de la moción, para que la otra parte radique su oposición a una moción presentada. Al querellante no haberse opuesto oportunamente a la solicitud de prórroga y al haber presentado su moción de anotación de rebeldía luego de que transcurrieron trece meses desde la solicitud prórroga, el querellante se allanó a la moción de prórroga de Pfizer, máxime si tomamos en cuenta que la reclamación fue incoada bajo el procedimiento sumario establecido en la Ley 2.

El querellante hizo referencia a lo resuelto en *Mercado Cintrón v. Zeta Com., Inc., supra*, para sostener su contención. Sin embargo, ese caso es distinguible del caso de autos debido a que en aquél, el querellado no solicitó prórroga para contestar la querella y presentó la contestación a la querella treinta y tres días luego de haber sido emplazado. En el caso de autos, Pfizer radicó una moción de prórroga y presentó su contestación a la querella antes de que el Tribunal de Primera Instancia emitiera su orden requiriéndole que contestara la querella.

Por otro lado, el Tribunal de Primera Instancia tenía la prerrogativa de no aceptar la contestación a la querella presentada por Pfizer, por haberse presentado luego del término de los diez días mas; sin embargo, lo que hizo fue que le ordenó a Pfizer contestar inmediatamente la querella. Esa actuación del Tribunal de Primera Instancia implícitamente constituye la concesión de una prórroga.

De otra parte, cuando el tribunal *a quo* emitió la orden en que denegó la solicitud de prórroga y le ordenó a Pfizer contestar la querella sin mayor dilación, ya la orden era académica, puesto que Pfizer ya había contestado la querella en cuestión. La orden del tribunal *a quo* fue notificada el 24 de mayo de 2001 y la contestación a la querella fue presentada el 19 de abril de 2001.

Finalmente, no consideramos que el tribunal *a quo* abusó de su discreción al acoger la contestación a la querella de Pfizer, ante la ausencia de una oposición y ante una solicitud de anotación de rebeldía que fue presentada tardíamente.

Resolvemos que el tercer error señalado no se cometió.

Con estos antecedentes, se confirma la sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Aida Ileana Oquendo Graulau
Secretaria General

**ESCOLIOS 2004 DTA 120**

**1.** El texto de la carta del Dr. Suárez Castro es el siguiente:

*"Tuve la oportunidad de evaluar al Sr. Luis Pabón Marrero, quien ha sido mi paciente desde el 5 de agosto de 1999. El Sr. Pabón fue visto inicialmente en esa fecha por una lesión sufrida jugando baloncesto. El paciente tenía episodios repetidos de que se le trancaba la rodilla. Recientemente, antes de esa visita se le había ido la rodilla en blanco con muchos problemas. El examen inicial mostró una rotura del ligamento cruzado anterior, crónica. Se recomendó una reconstrucción del ligamento cruzado anterior. En esos momentos, el paciente trabajaba como mecánico industrial con la Compañía Warner Lambert. Se programó la reconstrucción y se llevó a cabo el día 30 de agosto de 1999. Los hallazgos operatorios fueron: una rotura del ligamento cruzado anterior, una rotura tipo asa de cubo del menisco medial y una leve condromalacia del cóndilo femoral medial. El paciente fue visto en varias ocasiones luego de su cirugía. Se le dio seguimiento en cuanto a sus programas de rehabilitación. En la última visita, el día 27 de diciembre de 1999, cuatro meses después de la reconstrucción, el paciente había respondido muy bien a su rehabilitación, había conseguido el arco de movimiento de su rodilla prácticamente completo, y se decidió permitirle regresar a su trabajo con cita en dos meses.*

*El paciente vuelve a la oficina el día 24 de febrero de 2000 en visita de seguimiento describiendo un movimiento de flexión marcada que le produjo dolor. En esa visita, el examen presentaba dolor sobre el ligamento colateral medial. No presentaba líquido y el injerto se sentía fuerte sin ninguna inestabilidad. En vista del examen y del hallazgo inflamatorio, se decidió inyectarle el área de dolor. Se le recomendó que continuara con su trabajo, pero con limitaciones para ciertas funciones de trabajo físico, tales como estar de pie por tiempo prolongado, empujar o levantar equipos muy pesados, y en particular, el intentar evitar los turnos nocturnos en lo que terminaba su proceso de rehabilitación.*

*Para el tipo de trabajo que llevaba a cabo el Sr. Luis Pabón Marrero, cinco meses después de una reconstrucción, él aún presentaba ciertas limitaciones. Su trabajo exigía que se llevaran a cabo múltiples actividades físicas. El procedimiento que se efectuó en su rodilla no fue una simple artroscopia de rodilla, sino una reconstrucción de ligamento, que en su caso particular se pudo llevar a cabo a través de microcirugía. El tiempo promedio de recuperación para este tipo de cirugía, en atletas, toma de diez a doce meses de rehabilitación para poder regresar a su actividad deportiva con pocas limitaciones. La última visita del paciente fue el día 3 de agosto de 2000, donde presentaba varios dolores en la rodilla derecha. No presentaba líquido y había un punto sensitivo en la coyuntura lateral. Básicamente eran quejas leves en cuanto a su rodilla. Se le recomendó continuar con un programa de rehabilitación y se le dio cita de seguimiento para cuando tuviera algún tipo de problema.*

*El paciente aparentemente intentó regresar a su trabajo a los cinco meses de la operación, pero se encontró con el hecho de que no se le permitió continuar trabajando en vista de las limitaciones físicas presentadas. Por dicha razón, el paciente no fue aceptado en su trabajo y se quedó sin empleo.*

*En el día de hoy, el examen físico en cuanto a su rodilla derecha no presenta cojera al caminar. El examen de la rodilla derecha presenta un arco de movimiento normal. La estabilidad de la rodilla presenta una prueba de Lachman a un nivel entre 1 y 2. Esto presenta una leve laxitud anteroposterior, pero nada fuera de lo usual en un caso de reconstrucción de*

*ligamento. El examen físico no presenta inestabilidad medial o lateral, y tiene una buena fuerza de quadriceps.*

*En estos momentos, el Sr. Luis Pabón no tiene ninguna limitación para llevar a cabo sus trabajos para los cuales él está entrenado. El porciento [sic] de incapacidad que presenta en su rodilla derecha, debido a que perdió el menisco medial y tuvo una rotura de ligamento cruzado anterior, corresponde a un 10% de limitación en sus funciones generales."*

**2.** El certificado médico disponía lo siguiente:

*"Dr. López:*

*Este joven tuvo una reconstrucción de ligamentos en la rodilla derecha. El tiempo usual para retornar a las actividades deportivas es de 8-12 meses. En el caso de este paciente, el tipo de actividad física en su trabajo como mecánica pudiera ser un problema durante los próximos 3 meses. Pensé que pudiera volver a los 6 meses con ciertas limitaciones. En cuanto a su radiografía de la rodilla, no tiene osteoporosis, simplemente los cambios normales que se ven después de esta operación. Atentamente, (firmado Suárez Castro)"*

**3.** El querellante no señaló, sin embargo, cuáles eran esas excepciones y si su caso recaía dentro de una de éstas.